UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-CR-20608-MOORE/MCALILEY

UNITED STATES OF AMERICA,

Plaintiff,

v.

AMAURY RODRIGUEZ,

Defendant.
_____/

**REPORT AND RECOMMENDATION**
**REGARDING INVOLUNTARY MEDICATION**

The Defendant, Amaury Rodriguez, has been charged with violating the terms of his supervised release. He is in the custody of the Bureau of Prisons, specifically the Federal Medical Center at Butner, North Carolina (FMC Butner), pending his supervised release revocation hearing. Rodriguez is suffering from mental illness, and has been since he was brought into custody over a year ago. Rodriguez is mentally incompetent to participate in his revocation hearing and needs antipsychotic medication, which he has refused. For the reasons that follow, I recommend that this Court authorize the medical staff at FMC Butner to administer antipsychotic medication to Rodriguez without his consent for the purpose of restoring his competency.

**I. Background**

In early 2006, the Federal Bureau of Investigation (FBI) began to investigate Rodriguez for unlawful distribution of child pornography. Rodriguez, was 21 years old at

1

the time and a student at the University of Central Florida. In June of that year FBI agents interviewed Rodriguez. He admitted that he had downloaded images of child pornography from the Internet to his computers, and he consented to agents searching his laptop computer, where they found more than 800 child pornography images. [DE 14]. Rodriguez told the FBI agents that at the age of 21 he had engaged in sexual relations with a 12 or 13 year old boy. [*Presentence Investigation Report*, p. 9]. In August of 2006, state authorities arrested Rodriguez, and in May of 2008, the State of Florida adjudicated Rodriguez guilty of Lewd or Lascivious Battery and sentenced him to 94.5 months imprisonment, followed by a lengthy period of probation. [*Id.*].

Thereafter, in July of 2009, Rodriguez was charged before this Court by Information, with one count of unlawful distribution of child pornography images. [DE 1]. Rodriguez pled guilty to that charge [DE 12], and in January of 2010, the Court sentenced him to a 72 month term of imprisonment, followed by an 84 month term of supervised release. [DE 29]. The Court later amended its Judgment to clarify that the sentence of imprisonment would run concurrently to Rodriguez's state term of imprisonment. [DE 36].

It appears that Rodriguez first experienced symptoms of schizophrenia in 2010, while he was imprisoned in state custody. [DE 83-1, p. 3]. During this time he took Lithium and Risperidone for a month or two. [*Id.* at p. 4]. Records show that Rodriguez was severely mentally ill when he was placed in federal custody in 2015. [*Id.* at p. 3]. Rodriguez was released from custody in May 2016 [DE 37, p. 2], and in June his family briefly hospitalized him in Miami, involuntarily, for psychiatric treatment; he was

2

prescribed antipsychotic medicine, which he briefly took and then discontinued. [DE 55-1, p. 5].

Upon his release from prison, Rodriguez began to serve his sentence of supervised release.[1] Among the conditions of his supervision are the requirements that Rodriguez follow the instructions of his probation officer, and participate in an approved inpatient/outpatient mental health treatment program. [DE 36]. On June 27, 2016, only weeks after his release from custody, Rodriguez's Probation Officer filed a Petition with this Court that charges Rodriguez failed to meet those conditions. [DE 37]. In particular, the Petition states that in June of 2016, the Probation Officer instructed Rodriguez to comply with his physician's prescribed treatment regime for his mental illness, to include taking medication, and that Rodriguez had refused to follow those instructions. [*Id.* at p. 3].

The Court issued a warrant for Rodriguez's arrest and he first appeared before this Court on July 1, 2016. [DE 39]. Days later, the Court ordered Rodriguez held without bond pending his supervised release revocation hearing, and at that time defense counsel orally asked the Court to order that Rodriguez be evaluated to determine his competency to participate in these proceedings. [DE 42]. The Court granted that motion and ordered the Bureau of Prisons to conduct a psychiatric examination of Rodriguez to assess his competency. [DE 45].

---

[1] Rodriguez is also currently serving his state sentence of probation.

Dr. Jorge Luis, a forensic psychologist employed by the Bureau of Prisons at the Federal Detention Center in Miami (FDC Miami), where Rodriguez was housed, prepared a report that was later filed with the Court. Dr. Luis advised that Rodriguez was experiencing delusional thinking, that he appeared to be suffering from schizophrenia and was severely impaired, that he had refused prescribed medication and was not mentally competent. [DE 55-1]. On November 3, 2016, this Court held a competency hearing and heard from (1) Dr. Luis; (2) Rodriguez's supervising Probation Officer; (3) Rodriguez and (4) counsel. The Court found that Rodriguez was incompetent as defined by 18 U.S.C. §4241(a), and ordered that he be hospitalized, evaluated and treated for a period of up to four months. [DE 56]. The Court further ordered the director of FMC Butner to advise the Court whether Rodriguez could be restored to competency. [*Id.*]. Rodriguez was admitted to FMC Butner on December 12, 2016.

On April 28, 2017, the Warden of FMC Butner provided this Court with a written Forensic Evaluation prepared by Dr. Gillespie Wadsworth, a forensic psychologist at that institution. [DE 65-1]. The lengthy report draws upon historical information found in Dr. Luis's forensic evaluation report, the presentence investigation report and Bureau of Prisons medical and psychology records, along with the results of routine medical care, and observation of Rodriguez and interaction with him by FMC Butner staff. [*Id.*][2] Dr. Wadsworth reported that Rodriguez's thinking was disorganized and delusional; that he appeared to experience auditory hallucinations; and that he had engaged in inappropriate

---

[2] Dr. Wadsworth reported that Rodriguez was not administered psychological testing, due to his altered mental state. [*Id.* at p. 7].

sexualized behavior that led to his transfer to a restrictive housing unit. [*Id.*]. She also advised that Rodriguez was suffering from Schizophrenia, Continuous,[3] that he was not competent, and that his condition required antipsychotic medication. [*Id.* at pp. 8-9]. Dr. Wadsworth reported that after repeated refusals to take medication, in March, 2016, Rodriguez agreed to take Lithium, a mood stabilizer, which he considered "a natural substance" and that in early April he agreed to take Risperdal, an antipsychotic. [*Id.* at pp. 6-7]. She advised that with that medication Rodriguez's condition had "gradually improved," that he was slowly regaining privileges and that at the time of her report his illness was "in partial remission." [*Id.* at p. 7]. She was clear, however, that Rodriguez had not yet been restored to competency. [*Id.* at p. 9]. Dr. Wadsworth reported that it was too early to evaluate the efficacy of the medication, although she believed that continued treatment with antipsychotic medication would likely restore Rodriguez's competency. [*Id.* at pp. 7, 9]. She asked the Court to extend Rodriguez's hospitalization to allow for continued treatment. [*Id.* at p. 9].

On May 24, 2017, the Court held a hearing that Dr. Wadsworth attended by telephone. She advised that in the several weeks that followed her report, Rodriguez had continued to take medication and had shown significant improvement. Although Rodriguez was still incompetent, Dr. Wadsworth believed there was a substantial probability that continued treatment with medication would restore Rodriguez to

---

[3] Dr. Wadsworth wrote that Rodriguez may suffer from Pedophilic Disorder, but stated: "I have no opinion as to whether Rodriguez either has or does not have this diagnosis. There is information both supporting and not supporting this diagnosis." [*Id.* at p. 9].

competency. [DE 66]. She advised that it could take between three to twelve months for the effectiveness of the medication to be known and recommended that the Court authorize an additional four months of hospitalization, which the Court did on May 26, 2017. [*Id.*]. As before, the Court directed that, after a period of treatment, FMC Butner should again report to the Court. [*Id.* at p. 2].

The Warden of FMC Butner did so on July 19, 2017. He forwarded a July 13, 2017 Forensic Evaluation prepared by Dr. Wadsworth. [DE 84-1]. She reported that Rodriguez once again was refusing medication, that his mental condition had "rapidly deteriorated" and that he was plainly incompetent. [*Id.* at p. 6]. Dr. Wadsworth noted that Rodriguez's positive response to medication demonstrated that he has a "treatment-responsive illness" and she offered her opinion that a "substantial probability exists that Mr. Rodriguez' competency to stand trial can be restored with the proposed treatment of antipsychotic medicine." [*Id.* at p. 7]. Dr. Wadsworth asked the Court to authorize FMC Butner to treat Rodriguez with medication, without his consent, to attempt to restore him to competency. [*Id.*].

Dr. Wadsworth recognized that this Court could not enter such an order unless the Court found it justified under the four-part standard the Supreme Court set forth in *Sell v. United States*, 539 U.S. 166 (2003). The first step in that analysis asks whether "important governmental interests are at stake" in the adjudication of Rodriguez on the pending charges. *Sell*, 539 U.S. at 180. The medical professionals at FMC Butner offered

no opinion about this largely legal question. [DE 84-1, p. 7].[4] The second, third and fourth steps require factual findings based, in significant part, on medical and other information that FMC Butner must provide. Understanding this, Dr. Wadsworth offered to provide a proposed treatment plan if the Court determined that the initial legal issue supported an order of involuntary medication. [*Id.* at p. 7].

After consulting with counsel, the Court directed counsel to file legal memoranda that addressed the first *Sell* issue [DE 70], which they did [DE 72, 74]. Thereafter, on August 9, 2017, the Court heard oral argument on that issue and concluded that important governmental interests support the involuntary medication of Rodriguez. [DE 76]. With that threshold issue resolved, the Warden at FMC Butner thereafter provided the Court with Dr. Logan Graddy's proposed Forensic Treatment Plan for Rodriguez. [DE 83-1]. Dr. Graddy is a staff psychiatrist at FMC Butner, and he attached to that Plan a general resource document that he and another physician authored, the FMC Butner *Sell* Appendix 2017 ("Appendix"). [DE 82-1].[5]

---

[4] I consider the first step a mixed question of law and fact. The Fourth Circuit observed that whether the government's interest is "important" is a legal question it reviews *de novo*, although it reviews for clear error any factual findings relevant to that determination. *United States v. Evans*, 404 F.3d 227, 236 (4th Cir. 2005) (collecting cases). *Compare United States v. Green*, 532 F.3d 538, 546 (6th Cir. 2008) (the first *Sell* factor is a legal conclusion that is reviewed *de novo* (collecting cases).

[5] The Appendix provides scientific information regarding the use of antipsychotic medication to treat schizophrenia and other psychotic disorders. It includes: (1) data on the effectiveness of the medication in restoring persons to competency; (2) the medical appropriateness of use of the medicine; (3) undesired side effects the medicine is known to cause and how that can be monitored and treated; (4) the relative benefits of various antipsychotic medications; and (5) examples of how medical personnel might implement a treatment plan. The Appendix does not include specific information about Rodriguez or his medical condition, and for that reason, it was made a part of the Court's publically available docket.

On September 6, 2017, the Court held an evidentiary hearing to address the second, third and fourth *Sell* factors. [DE 78].[6] Dr. Wadsworth and Dr. Graddy, along with Rodriguez, testified at the hearing by video conference.[7] I have carefully reviewed that testimony, the record in this matter and the applicable law, and I conclude that an order authorizing the involuntary medication of Rodriguez is justified under the *Sell* standard.

## II. ANALYSIS

In *Sell v. United States*, the Supreme Court held that under limited circumstances the Fifth Amendment Due Process Clause permits the government to administer medication to a defendant, against his will, to restore him to competency. For this to happen, the court must find the following: (1) the government has important interests in adjudicating the defendant; (2) involuntary medication would significantly further those interests; (3) involuntary medication is necessary to further the government's interests; and (4) it is medically appropriate, *i.e.*, it is in the defendant's best medical interest given his medical condition. 539 U.S. at 180-81.

The Supreme Court directed that before the Court addresses these issues, it should first consider whether the government may involuntarily medicate the defendant for other reasons. Specifically, if the defendant poses a danger to himself or others, or his refusal to take medication puts his own health at grave risk, then the court should consider whether

---

[6] The transcript of that hearing has been filed at DE 85.

[7] Defense counsel spoke with his client in preparation for the hearing. [DE 85, pp. 5, 70]. FMC Butner made arrangements so that Rodriguez and his attorney could speak privately by telephone during the hearing, if needed. [*See* DE 76, p. 2].

involuntary medication may be ordered under the standard the Court set forth in *Washington v. Harper*, 494 U.S. 210 (1990). *Sell*, 539 U.S. at 182-3.

The government bears the burden of proving the necessary factual findings by clear and convincing evidence. *U.S. v. Diaz*, 630 F.3d 1314, 1331-32 (11th Cir. 2011). I conclude that the government has met that burden of proof here.

## A. No alternative grounds

Both Drs. Graddy and Wadsworth are clear that under the current conditions of his confinement, Rodriguez does not pose a danger to himself or others. Moreover, he is in good physical health. [DE 65-1, p. 5; DE 84-1, pp. 3, 5]. Both doctors expressly offered their opinion that Rodriguez does not meet the criteria set forth in *Washington v. Harper* for involuntary medication, and this Court has no information to suggest otherwise. [DE 84-1, p. 7; DE 83-1, p. 5]. I therefore turn to the four *Sell* factors.

## B. Important governmental interests

The Supreme Court in *Sell* sought to balance the government's interest in adjudicating a mentally incompetent defendant, with the defendant's liberty interest in avoiding unwanted medication. To this end, the Court directed that, before a defendant can be involuntarily medicated, a court must find "that *important* governmental interests are at stake." 539 U.S. at 180 (emphasis in original). The Court then offered this explanation:

> The Government's interest in bringing to trial an individual accused of a serious crime is important. That is so whether the offense is a serious crime against the person or a serious crime against property. In both instances the Government

seeks to protect through application of the criminal law the basic human need for security.

*Id.*

### 1. *Sell* applies to supervised release revocation proceedings

When the Court made reference to bringing a defendant "to trial" it did not clarify whether this might encompass a supervised release revocation hearing. Another District Court has thoroughly considered that question and concluded that the *Sell* decision does not exclude supervised release revocation hearings. *United States v. Baugh*, 776 F. Supp. 2d 172 (E.D.Va. 2011). I believe this Court should reach the same conclusion.

The defendant in *Baugh* was on supervised release after he was imprisoned for drug offenses. Baugh had a history of psychosis and it was a condition of his supervised release that he undergo mental health treatment. *Id.* at 173-4. While on supervised release Baugh committed a misdemeanor assault[8] and he did not satisfactorily participate in a mental health treatment program; his probation officer charged that he thus violated his supervised release. *Id.* at p. 174. The court found that Baugh was mentally incompetent and he was hospitalized at FMC Butner for treatment, where he refused medication. *Id.* at 175. After a hearing the court authorized the medical staff to involuntarily medicate Baugh. *Id.* at 175-6.

In reaching that decision, the court rejected Baugh's threshold argument that the Supreme Court's use of the word "trial" in the *Sell* decision precludes involuntary medication of a defendant charged with violating conditions of supervised release. The

---

[8] A state court sentenced Baugh to a six-month suspended sentence for that crime. *Id.* at 174.

*Baugh* Court noted the obvious, that the defendant in *Sell* was facing trial and the Supreme Court's reference to trial thus made perfect sense. The *Baugh* Court also found that nothing in the *Sell* opinion suggested the Supreme Court meant to confine its decision to adjudications at trial. The *Baugh* Court observed that a supervised release revocation hearing is the "functional equivalent of a trial" in many regards; most importantly, both place the defendant's liberty at stake. *Id.* at 177.

As for the *Sell* Court's acknowledgment of the government's important interest in protecting the public (what it termed "the basic human need for security") this motivation is often behind the government's prosecution of supervised release violations. As the *Baugh* Court noted, with its enforcement of supervised release conditions, the government "protect[s] the public from individuals who, despite already having been convicted of a crime or crimes, continue to flout the law or the terms of a lawfully imposed sentence, or both." *Id.*

I am persuaded that the standard the Supreme Court set out in *Sell*, for authorizing involuntary medication of a mentally ill defendant for the purpose of restoring that defendant to competency, may be applied to a defendant charged with violation of the conditions of his supervised release.

## 2. The government has an important interest in adjudicating Rodriguez (*Sell* #1)

As noted above, the Supreme Court recognized the government's important interest in bringing to trial an individual "accused of a serious crime," which it did not define. 539 U.S. at 180. Circuit courts of appeal have addressed that subject, and as one

Court noted, there is a "debate among our sister circuits about whether the seriousness of a crime is measured by the statutory maximum [penalty] or the likely guideline sentence, or both." *United States v. Dillon*, 738 F.3d 284, 292 (D.C. Cir. 2013).[9]

I am persuaded that the best objective measure is the maximum penalty authorized by statute, which is the standard used by the Second, Fourth, Fifth, Sixth and Eighth Circuits. *See, United States v. Mackey*, 717 F.3d 569, 573 (8th Cir. 2013) ("we agree with those circuits that place the greatest weight on the maximum penalty authorized by statute"); *United States v. Gutierrez*, 704 F.3d 442, 451 (5th Cir. 2015) ("we follow the approach of several other circuits in comparing the time already served by [defendant] with the statutory maximum authorized for his indicted offenses"); *United States v. Green*, 532 F.3d 538, 550 (6th Cir. 2008) ("we conclude that a district court may rely on the potential statutory penalty to determine whether the crime meets the 'serious' requirement"); *United States v. Evans*, 404 F.3d 227, 237 (4th Cir. 2005) ("it is appropriate to focus on the maximum penalty authorized by statute in determining if a crime is 'serious'"); *United States v. Gomes*, 387 F.3d 157, 160-61 (2nd Cir. 2004). As those courts noted, the statutory maximum penalty provides an objective measure that avoids arbitrary application and "respects legislative judgments regarding the severity of the crime." *Evans*, 404 F.3d at 237; *see also Green*, 532 F.3d at 549.[10]

---

[9] The *Dillon* Court did not decide the question because the defendant conceded the seriousness of his alleged offense. *Id.*

[10] In reaching this conclusion, those courts noted that the Supreme Court, in other contexts, has looked to the penalty authorized for particular crimes to measure the seriousness of those crimes. *Evans, id.* at 237; *Green, id.* at 549 (both collecting cases).

Courts that favor the statutory maximum yardstick disfavor using the Sentencing Guidelines as a measure of seriousness. This is because the Sentencing Guidelines are not determined with certainty until after a defendant has been convicted; they are not binding on the court, and they reflect the views of the Sentencing Commission rather than Congress. *See e.g., Evans*, 404 F.3d at 238 (this approach would be "unworkable because at this stage in the proceedings, there is no way of accurately predicting what that range will be"); *Gutierrez*, 704 F.3d at 451;[11] *Green*, 532 F.3d at 549-50.

In contrast, the Ninth Circuit has concluded that "the likely guideline range is the appropriate starting point for the analysis of a crime's seriousness" because it is the "best available predictor of the length of a defendant's incarceration." *Hernandez-Vasquez*, 513 F.3d 908, 919 (9th Cir. 2008). The Tenth Circuit appears to have taken a more middle-of-the-road approach to the question: "Whether a crime is 'serious' relates to the possible penalty the defendant faces if convicted, as well as the nature or effect of the underlying conduct for which he was charged." *United States v. Valenzuela-Puentes*, 479 F.3d 1220, 1226 (10th Cir. 2007). In that case the court considered "the maximum sentence of twenty years and a likely guideline sentence of six to eight years sufficient to render the underlying crime 'serious.'" *Id.*

---

[11] In *Gutierrez,* the Fifth Circuit wrote: "More importantly, even if it were possible to produce an accurate presentence report in advance of a *Sell* hearing, this would not take into account the broad discretion of the district judge to impose a sentence outside the advisory guidelines range. It is not appropriate either to require a district court to conduct a mock sentencing hearing and select a provisional sentence at a *Sell* hearing, or to prematurely speculate about a defendant's possible sentence in an interlocutory appeal." 704 F.3d at 451.

Turning to Rodriguez, if he is found guilty of either or both of the charged violations of his supervised release, the Court will be authorized by statute to sentence Rodriguez to up to an additional two years in prison, *see* 18 U.S.C. §3583(e)(3),[12] and to a new term of supervised release of no less than five years, and as long as his life, *see* 18 U.S.C. § 3583(k). The latter extreme statutory maximum penalty — a lifetime of supervision — arises because Rodriguez's crime of conviction involved a minor victim. 18 U.S.C. § 3583(k). Congress' authorization that this Court may sentence Rodriguez to a lifetime of court supervision is a compelling statement of the seriousness of the charged offense.[13] Additionally, the possible two-year statutory term of incarceration is a sufficiently lengthy period of incarceration to mark the offense as serious.[14]

An interesting question here is whether this Court should also look to the statutory maximum penalties of the crime for which Rodriguez was convicted. The *Baugh* Court thought this was appropriate, and did so. 776 F.Supp. at 180. The statutory penalty for Rodriguez's crime of conviction, distribution of child pornography, was a minimum term of imprisonment of five years, and a maximum term of twenty years. 18 U.S.C. §

---

[12] This is the term of incarceration applicable for a violation of supervised release where the offense of conviction is a Class C felony. *Id.*

[13] Rodriguez is a young man. Given the chronic mental illness that profoundly affects his behavior, the nature of his crimes of conviction, and the multitude of conditions of his supervised release [*see Amended Judgment*, DE 36], a lifetime of supervision by the Court would likely involve highly restrictive monitoring.

[14] The Court is mindful that many maximum terms of incarceration in federal law are considerably longer, and to the extent the statutory maximum penalty is a measure of seriousness, there likely is a point below which an authorized period of incarceration would not support a finding of seriousness. This Court need not resolve that issue, given the several compelling objective measures of the seriousness of Rodriguez's charged offenses.

2252(a)(2) and (b)(1).[15] Both the minimum and maximum periods of incarceration indisputably mark the seriousness of the offense for which Rodriguez was convicted and is now under this Court's supervision.

In sum, the authorized statutory penalties, in both instances, are a clear reflection of the serious nature of Rodriguez's crime of conviction, and alleged violation of his supervised release.[16]

The Eleventh Circuit has not resolved the debate, in the *Sell* context, whether statutory or advisory Guideline penalties are a better measure of the seriousness of a crime. In one case it did something different: it upheld a district court's finding that the facts of that particular case supported the conclusion that the crime was serious. *United States v. Fuller*, 581 Fed. Appx. 835, 836 (11th Cir. 2014). Similarly, some courts have looked to the nature of the charged violations, when evaluating "seriousness."[17] Here, the pending charges, that Rodriguez did not participate in his approved mental health

---

[15] The Court was also authorized to impose a fine of up to $250,000 for this Class C felony, *see* 18 U.S.C. §3571(b)(3), and a term of supervised release of not less than five years or more than life. 18 U.S.C. § 3583(k).

[16] The advisory Sentencing Guidelines suggest that if found guilty of the pending charges, which are Grade C violations, *see* U.S.S.G. § 7B1.1(a)(3)(B), Rodriguez could be sentenced to a term of incarceration of four to ten months, *see* U.S.S.G. § 7B1.4(a), followed by a period of supervised released, which as noted, may extend for life. *See* U.S.S.G. § 7B1.3(g)(2); 18 U.S.C. §§ 3583(h), (k).

[17] For example, in *Mackey*, the Eight Circuit rejected the defendant's argument that the crime he was accused of (the "status offense" of failing to register as a sex offender) was not "serious" under *Sell*. In doing so it noted "the legislative determination that sex offenders who are not properly registered present a serious risk to the safety of the community." 717 F.3d at 574. The Court wrote: "Even where the commission of an offense does not itself harm others directly, society may have a strong interest in prosecuting the violation and imposing punishment." *Id.*

treatment program as instructed, are without doubt serious.[18] Rodriguez's crimes of conviction include his endangerment of children. The Probation Office has the important task of monitoring Rodriguez in an effort to ensure that he does not present a threat to others. His compliance with mental health treatment is critical to this effort. Plainly, the government has a compelling interest in restoring Rodriguez to mental competency so that it can then adjudicate him on the pending charges and have the Court resume its supervision of Rodriguez.

### 3. Special circumstances do not lessen the government's interests

In *Sell*, the Supreme Court stated that courts "must consider the facts of the individual case in evaluating the Government's interest in prosecution" and noted that "[s]pecial circumstances may lessen the importance of that interest." 539 U.S. at 180. *See also United States v. Pfeifer*, 661 Fed. Appx. 618, 620 (11th Cir. 2016). The Court then offered examples of those "special circumstances." One would be if Rodriguez was expected to face a lengthy civil commitment in an institution for the mentally ill. The Supreme Court posited that this might lessen the government's concern about Rodriguez not being adjudicated on the pending charges. 539 U.S. at 180.

Here, there is no indication that Rodriguez will be subject to a civil commitment. That would require a determination, pursuant to 18 U.S.C. §§ 4246 or 4248, that upon release Rodriguez would create "a substantial risk of bodily injury to another person or serious damage to property of another," or that he is a "sexually dangerous person." 18

---

[18] Notably, the *Baugh* Court reached the same conclusion. 776 F. Supp.2d at 181.

U.S.C. §§ 4246(a) and 4248(a), respectively. That assessment has not been made and it would be pure speculation for the Court to forecast Rodriguez's lengthy civil commitment. "[T]he government's interest in prosecution is not diminished if the likelihood of civil commitment is uncertain." *Gutierrez*, 704 F.3d at 450 (collecting cases). That is the case here.

The Supreme Court also observed that if the defendant has been confined for a lengthy period of time, for which he would receive credit for any sentence ultimately imposed, that this might lessen the government's interest in his adjudication. 539 U.S. at 180. Rodriguez began to serve his 84 month term of supervised release on May 17, 2016. As of this date approximately 67 months (or about 5.5 years) remain on that term.[19] If the Court orders Rodriguez's involuntary medication, it can reasonably expect (for reasons that will be explained) that the efficacy of that medication in restoring him to competency will be known in a matter of months. If treatment is effective, years will remain on Rodriguez's sentence of supervision when he returns to this Court for adjudication. Rodriguez's extended hospitalization at FMC Butner has not diminished the government's important interest in adjudicating Rodriguez.

Last, the Supreme Court suggested that an extended pretrial confinement might undermine the government's ability to prosecute if witness memories fade or evidence is lost. 539 U.S. at 180. There is no indication that this is a concern here. The charges against Rodriguez are simple and straightforward (that he did not follow his probation

---

[19] As already noted, the Court has the authority, if Rodriguez is adjudicated guilty, to extend that term as long as Rodriguez's natural life.

officer's instruction and did not take prescribed medication), and are presumably easily proven.

This Court finds that the nature of Rodriguez's criminal conduct, and the impact his mental illness has on that behavior, is an additional special circumstance that weighs in favor of his involuntary medication. Notably, the Fourth Circuit has found that the possibility that a defendant could pose a public threat weighed in the government's favor on the first *Sell* factor. *United States v. Sanderson*, 521 Fed.Appx. 232, 237 (4th Cir. 2013). Specifically, the Court noted the defendant, who was pending trial on charges of failing to register as a sex offender, had a history of violent offenses and it expressed concern that the defendant, who did not appear to be a candidate for civil commitment, "will go free if he is not restored to competency." *Id.*

This Court has the same concern. Rodriguez's serious illness is, at the very least, a contributing cause of his erratic and worrisome behavior. That illness has profoundly impaired his ability to make a rational choice about the merits of prescribed medication or to recognize the inappropriateness of his behavior. Restoring Rodriguez to competency appears to be the best hope to attempt to engage his compliance with the terms of his supervision, with the important goal of ensuring that he does not threaten others. This factor strongly weighs in favor of the government's interest in Rodriguez being restored to competency.

For all these reasons, I conclude that the government has an important interest in adjudicating Rodriguez for his alleged failure to follow the treatment plan prescribed by his mental health care provider.

## C. The three remaining *Sell* factors

The remaining *Sell* factors require the Court to make factual findings concerning the government's proposed treatment plan. Before turning to that plan, I note that the record fully supports the diagnosis that Rodriguez suffers from schizophrenia, which is a chronic condition. [DE 85, p. 73].[20] In his report, Dr. Graddy documented that Rodriguez regularly experiences auditory (voices) and visual hallucinations, and delusions "mainly along bizarre and grandiose religious themes." [DE 83-1, at p. 3; *see also* DE 85, p. 25]. Rodriguez's delusions affect his behavior, to include his undertaking extended fasts, engaging in sexual behavior with other inmates and referring to Dr. Graddy as the Pope. [DE 83-1, p. 3, n.3]. Rodriguez's speech is often disorganized, making it difficult to communicate with him; Rodriguez has also displayed "negative symptoms" of the illness, such as decreased interest in normal social activities or social input.[21] In her reports, Dr. Wadsworth extensively documented Rodriguez's hallucinations, irrational thoughts and sexually inappropriate conduct and detailed why these behaviors have required his housing in a "secure movement unit" at FMC Butner. [DE 65-1; DE 84-1; *see also* DE 85, p. 83-85].

Rodriguez testified at the September 6, 2017, hearing. He was polite, but he appeared largely unable to follow the Court's direction to wait his turn to testify, and he repeatedly interrupted Dr. Graddy's testimony. His testimony was disorganized, irrational

---

[20] Dr. Graddy's diagnosis includes "continuous" to indicate that Rodriguez has continually experienced an acute episode. [DE 83-1, pp. 2-3; DE 85, p. 72].

[21] Negative symptoms are manifested through the absence of normal emotional expression and interest in normal social activities. [DE 83-1, p. 2, n.1].

and filled with impertinent religious references. Rodriguez offered what appeared to be his qualified and somewhat shifting consent to take some medications (including Haloperidol), but on conditions that were not medically rational. [*See e.g.,* DE 85, pp. 33, 35, 38-41, 57-58, 60-69].

### 1. The proposed treatment plan

Dr. Graddy proposes to begin treating Rodriguez with the antipsychotic medications Haloperidol or Risperidone.[22] He believes a third antipsychotic medication, Fluphenazine, would be a good alternative medication to try if Haloperidol or Risperidone are not effective, and thus asks the Court to authorize FMC Butner's use of any of these three antipsychotic medications. [DE 85, p. 100]. In the Appendix he prepared, Dr. Graddy notes that all three medications are commonly used to treat schizophrenia and they are available in both oral and injectable forms. [DE 82-1, pp. 8-9; *see also* DE 85, p. 100].

In his reports and at the hearing, Dr. Graddy explained how he would implement his proposed treatment plan if the Court authorizes involuntary treatment. First, he would show Rodriguez the court order and try to enlist Rodriguez's cooperation. If Rodriguez stated a preference for Haloperidol or Risperidone, then that would be the first medication used. [DE 85, pp. 34, 37-38, 41, 56-57, 74; DE 82-1, pp. 7-8; DE 83-1, p. 6].

---

[22] In his written report Dr. Graddy indicated he would first offer Haloperidol [DE 83-1, p. 7], but when he testified a couple weeks later he explained why he thought either medication would be a good first choice. [DE 85, p. 32-34, 37]. At the hearing, the brand names Haldol and Risperdal were used interchangeably with the generic names.

And, if he agreed to take either medication, Rodriguez could choose to take it by mouth or injection. [DE 82-1, p. 8-9; DE 85, p. 41-43].

Generally, the goal would be to "achieve clinical improvement at the lowest effective dose, at [the] low end of the target dosing range and gradually increas[e] the dose as clinically indicated." [DE 82-1, p. 8, ¶ 4]. If treatment is begun with the liquid form of Risperidone, the starting dose would likely be 6 mg per day, and if the injectable form is used, which is long-acting, the initial dose would be 50 mg at two week intervals. [DE 85, pp. 41-43].[23] If treatment were begun with Haloperidol, it would be with a low dose by mouth (between 5 to 15 mg per day) or a short-acting 5 mg injection, to observe how Rodriguez tolerated the medication.[24] If he tolerates it well, the dose would increase to a range of 75 and 150 mg every two weeks. [DE 85, pp. 34, 42-45; DE 82-1, p. 9, ¶ 10]. If Fluphenazine is used, the typical injected dose is 50 mg every two weeks, but an initial trial of 25mg every two weeks would be likely. [DE 82-1, p. 9, ¶ 8]. The dosing

---

[23] In his Appendix, Dr. Graddy writes that a starting dose of injectable Risperidone is typically 25 mg, which leads to a sustained release of the medication about four weeks later. [DE 82-1, p. 9, ¶ 9]. At the hearing Dr. Graddy explained that given Rodriguez's recent positive response to this drug, it would be "relatively easy and []quick to restart it" [DE 85, p. 34], at a potentially therapeutic dose of 50 mg. He explained that both the oral and injectable forms of Risperidone should ultimately result in the same blood level of the medication, although it would take longer to achieve that level using the injected form of Risperidone. This is a reason why Dr. Graddy would prefer to begin with the oral form of the medication, and once a therapeutic dose is achieved, he might then give Risperidone injections at two week intervals. [DE 85, pp. 41-42].

[24] This is because Haloperidol can occasionally cause a severe neuromuscular side effect, dystonia, when first given. [DE 85, p. 46]. Thus, a small amount of a short-acting medicine will first be given so that if, in the unlikely event Rodriguez experienced dystonia, it would last only as long as that initial dose, which would be a couple hours. [*Id.*].

range for the oral form is 2 to 20 mg daily. [*Id.* at p. 8]. These dosing ranges are considered typical and medically acceptable. [DE 82-1, pp. 8-9; DE 85, pp. 43-44].

If Rodriguez were to be administered injections involuntarily, that should be easily accomplished because, as part of his restricted housing, Rodriguez's hands are restrained when he leaves his housing unit. Dr. Graddy explained that an injection can easily be given in this circumstance. [DE 85, pp. 57, 76-77]. Dr. Graddy testified that it is rare that more restraints are needed, and that typically, once the medication begins to work, patients are cooperative. [*Id.* at pp. 76-77]. Based on his dealings with Rodriguez, Dr. Graddy expects that he will follow this "typical" course and become compliant once the medicine begins to work. [*Id.* at p. 75].

Medical staff would closely observe Rodriguez to note his response to the medicine. They would also collect and analyze blood samples to measure the serum concentration of the medication, which may guide them in dose adjustments. [DE 82-1, p. 8, ¶ 3; DE 85, pp. 44-45, 56].[25]

Dr. Graddy testified that once Rodriguez has had a therapeutic dose for three months, it would be a reasonable time to assess the effectiveness of antipsychotic medication in restoring Rodriguez to competency. [DE 85, p. 59].

---

[25] Dr. Graddy acknowledged that more restraints would be needed if a patient were to resist having blood drawn. [DE 85, pp. 77-78]. From this record it appears that blood would not need to be drawn until sometime after treatment has begun, when Rodriguez is likely to be cooperative.

## 2. Involuntary medication will significantly further the government interests (*Sell* # 2)

The second *Sell* factor requires the Court to determine whether involuntary medication will "significantly further" the government's important interests. This factor is satisfied if the medication is (1) "substantially likely to render the defendant competent to stand trial", and (2) "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." 539 U.S. at 181. The government, relying on the reports and testimony of Drs. Graddy and Wadsworth, has established the second *Sell* factor by clear and convincing evidence.[26]

### a. The proposed treatment plan is substantially likely to render Rodriguez competent

Both in his report and at the hearing, Dr. Graddy opined "with reasonable medical certainty" that his proposed treatment plan is substantially likely to restore Rodriguez's mental competency. [DE 83-1, p. 6; DE 85, pp. 29-30].[27] His opinion is based on his clinical experience, the improvement of Rodriguez's condition when he took medication, literature that reports the effectiveness of antipsychotic medication, and the experience of

---

[26] At the hearing, with the agreement of the parties, the Court recognized Dr. Graddy as an expert in forensic psychiatry [DE 85, p. 27], and recognized Dr. Wadsworth, a forensic psychologist who has been Rodriguez's primary evaluator since his arrival at FMC Butner, as an expert in the field of forensic psychology [*Id.* at 81-83].

[27] Dr. Graddy explained that "substantial likelihood" is a legal standard, and that "reasonable medical certainty" is a medical standard that has meaning to him. He explained that "to the degree [Rodriguez] is similar to previously studied Sell defendants," the treatment is substantially likely to achieve the goal of restored competency. [DE 85, pp. 29-30; *see also* DE 83-1, p. 6, n.8]. There is nothing in the record to suggest Rodriguez is dissimilar to the previously studied patients.

the medical staff at FMC Butner since the facility opened in 2000. [DE 83-1, p. 6; DE 85, pp. 29-31]. Dr. Wadsworth joined in this opinion. [DE 85, pp. 94-95].

In his Appendix, Dr. Graddy reviewed a series of published studies regarding the effectiveness of antipsychotic medication in restoring defendants, suffering from psychosis, to competency. [DE 82-1, p. 2]. The rates of competency restoration reported in the studies are uniformly high, ranging from 75 to 95 percent. [*Id.*].

Rodriguez's personal history with medication strongly supports the conclusion that a sustained trial at a therapeutic dose of appropriate antipsychotic medication is substantially likely will restore him to competency.

Medical records show that Rodriguez took Risperidone and Lithium while in state custody for one to two months, and he took Haloperidol in April 2016 when hospitalized after his release from custody. The record has little information about this, but is notable for the absence of reports that he suffered side effects from that medication. [DE 85, pp. 32-33].

Rodriguez's more recent experience taking medication at FMC Butner directly supports the second *Sell* finding. Specifically, on March 6, 2017, he agreed to take Lithium, a mood stabilizer, and on March 13, 2017 the dose was increased. [DE 83-1, p. 4].[28] On April 3, 2017, Rodriguez agreed to include the antipsychotic medication

---

[28] Rodriguez believed Lithium to be a "natural substance." [DE 65-1, p. 6]. At the hearing Dr. Wadsworth explained that Rodriguez expressed a willingness to take Lithium, and because there was a "mood instability evident in his presentation [it] . . . was likely a mood stabilizer, such as Lithium, may help with his presentation, while knowing that it was really an antipsychotic that would be the primary means of treatment to be recommended to address the delusions and

Risperidone, at the low dose of 2 mg. That dose was increased to 4 mg on April 12, 2017, and again to 6 mg on April 24, 2017. [*Id.*; *see also* DE 85, p. 87]. By May 22, 2017, Rodriguez's symptoms improved from a severe to a moderate level. [DE 83-1, p. 4]. His insight remained "very poor" however, and he would not agree to medication changes Dr. Graddy proposed, although he did agree to add 5 mg of the medication Aripiprazole (Abilify). [*Id*].

In her interim report to the Court dated April 25, 2017, Dr. Wadsworth advised that with this medication Rodriguez's "mental state and behavior have gradually improved" and his schizophrenia was in "partial remission." [DE 65-1, p. 7; *see also* DE 85, pp. 91-92]. This led to Rodriguez's transfer to a "locked transitional unit" and his slow regaining of privileges. [DE 65-1, p. 7; DE 85, pp. 89-90]. Importantly, Rodriguez did not display any side effects during treatment. [DE 85, p. 90]. Notably, these improvements were achieved before Rodriguez had the benefit of a sustained therapeutic dose of antipsychotics.

On May 25, 2017, not long after Dr. Wadsworth's interim report, Rodriguez stopped taking Risperidone and Lithium and on May 30, 2017 he discontinued Abilify. [DE 83-1, p. 4]. Rodriguez "rapidly deteriorated back to a severe level of psychosis" and he was moved back to the more restrictive housing unit. [*Id.; see also* DE 85, p. 92-93]. At that point he reported that the medication made him feel "groggy," a subjective complaint that medical staff could not verify. [DE 85, pp. 49, 90].

---

hallucinations that were evident for Mr. Rodriguez." [DE 85, p. 87; *see also* DE 65-1, p. 6]. For these reasons, a trial of Lithium commenced.

At the evidentiary hearing, Dr. Graddy testified that Rodriguez's improvement on medications is a significant reason for his belief that his proposed treatment plan would likely restore Rodriguez to competency. [DE 85, pp. 25-27; 31, 50, 55-56, 58].[29] Again, Dr. Wadsworth held the same opinion. [DE 85, pp. 94-95].

The Eleventh Circuit Court of Appeals has found that expert testimony from a treating forensic psychologist and psychiatrist, supported by statistical studies, "strongly demonstrate[d] a finding that the second *Sell* factor had been established." *United States v. Diaz*, 630 F.3d 1314, 1332 (11th Cir. 2011); *see also United States v. Ruark*, 611 Fed. Appx. 591, 598 (11th Cir. 2015). Notably, in *Diaz*, there was no evidence that the defendant had successfully responded to medication in the past. The Court rejected the defendant's argument that that evidence was necessary:

> [T]he lack of prior documented history of Diaz's reaction to anti-psychotic medication does not change our conclusion. Diaz presented no evidence to contradict the above findings or to show that he is not likely to have the favorable response common in the statistical data.

*Id.* at 1333. In contrast to *Diaz*, we have clear evidence of Rodriguez's very positive response to anti-psychotic medication. This record plainly supports this Court's finding that antipsychotic medication is substantially likely to render Rodriguez competent.

---

[29] Dr. Graddy testified: "Mr. Rodriguez has responded to medications . . . in the past, and that is another strong factor which leads me to believe that, with reasonable medical certainly, he is going to improve if he receives medication." [DE 85, p. 31].

**b. The proposed treatment plan is substantially unlikely to cause side effects that would interfere with Rodriguez's ability to assist his counsel**

Dr. Graddy offered his opinion, again with "reasonable medical certainty," that treatment with the proposed antipsychotics would be substantially unlikely to cause side effects that would significantly interfere with Rodriguez's ability to assist his attorney in these proceedings. [DE 83-1, p. 6; DE 85, pp. 49-50]. Again, Dr. Wadsworth joined in this conclusion. [DE 85, pp. 95-96].

Dr. Graddy's Appendix catalogues the possible side effects of each antipsychotic medication. [DE 82-1, pp. 4-7]. All antipsychotic medications have a risk of neuromuscular side effects; either sudden (acute) or delayed onset, some of which can be severe. [*Id.* at p. 4; DE 85, pp. 47-48]. This is particularly true for Haloperidol. [DE 85, p. 47]. Rodriguez would be monitored for these, and all other side effects. [DE 82-1, at p. 6]. Medical staff would attempt to avoid side effects by use of the lowest effective dose. [*Id.* at pp. 5-6; DE 85, p. 48]. If neuromuscular side effects occur, Rodriguez might be transitioned to a different antipsychotic medication, or if needed, treated with an added anticholinergic medication, or other adjunctive medication to counter the side effect. [DE 82-1, pp. 5, 10; DE 85, pp. 48-49].

Metabolic side effects, to include weight gain, diabetes or hyperlipidemia (high cholesterol) can also be caused by antipsychotic medication. [DE 82-1, p. 6]. Again, Rodriguez would be monitored for this, and if needed, counseled on diet and exercise that can address these side effects, or offered medication to treat the conditions. [*Id.* at pp. 6, 10]. Risperidone has been associated "to some degree" with elevations in serum

prolactin, which can cause breast enlargement in some patients. If this were to occur, Rodriguez might be switched to a different medication, or offered Aripiprazole (Abilify), to reverse the elevation in serum prolactin. [*Id.* at p. 6; DE 85, p. 100].

Last, there are extremely rare but dangerous side effects of antipsychotic medications. Neuroleptic malignant syndrome is one, but fortunately, the incidence rates are between 0.01% and 0.02% of treated individuals. [DE 82-1, p. 7]. The other is sudden death, presumably from cardiac arrhythmias. This risk is extremely low. [*Id.*].[30]

When Rodriguez took Risperidone at FMC Butner, no side effects were noted, other than his subjective complaint after he discontinued medication, that he felt "groggy." [DE 85, p. 90]. If Rodriguez experienced this again, the medical staff could adjust his treatment plan to address this. [*Id.*]

Dr. Graddy explained that the only known side-effects that could impede Rodriguez's ability to assist his counsel would be the neuroleptic malignant syndrome and sudden death. [DE 85, p. 49]. The Court agrees with Dr. Graddy that given the extremely low incidence of these side-effects, the fact that Rodriguez has already taken Risperidone and Haloperidol without incident and the fact that he is otherwise in good health, it is "substantially unlikely" that Rodriguez will experience these side effects. [*Id.* at p. 50].[31]

---

[30] Available data shows that the risk in the general adult population is about seven to 14 events per 10,000 person years, compared to 10 to 29 events per 10,000 person years in populations treated with antipsychotic medication. [*Id.*].

[31] The Eleventh Circuit has upheld this conclusion when it was supported by similar evidence. *Diaz*, 630 F.3d at 1333-34; *Ruark*, 611 Fed. Appx. at 598-99.

### 3. Involuntary medication is necessary to further the government's interests (*Sell* #3)

The Court must next decide whether involuntary medication is necessary to further the government's interests. The Court can authorize involuntary medication only if it first finds that there are no less intrusive treatments that are likely to achieve substantially the same result. *Sell*, 539 U.S. at 181.

Drs. Graddy and Wadsworth testified that treatment with antipsychotic medication is necessary to restore Rodriguez to mental competency. [DE 85, pp. 51, 94, 96].[32] They were clear that there are no less intrusive treatments, including psychotherapy, that are likely to achieve competency. [*Id.* pp. 51, 54, 94; *see also* DE 83-1, p. 6, n.10]. Dr. Graddy noted in his Appendix that antipsychotic medication is an "essential element in the treatment" of schizophrenia, and explained:

> There is no convincing evidence in the published literature that patients with chronic schizophrenia or related psychotic disorders significantly respond to psychotherapy alone compared to the response to treatment with antipsychotic medication augmented with psychosocial interventions. Most proponents of cognitive behaviorally oriented psychotherapy for schizophrenia acknowledge the biological basis of the disorder and actively promote medication compliance.

[DE 82-1, p. 3].

In *Sell*, the Court suggested trial courts consider whether a court order that threatens contempt if the defendant does not consent to medication, might be effective.

---

[32] In his report, Dr. Graddy wrote that he had "no opinion in regards to state interests," that is, the first *Sell* inquiry that presents a legal question for the Court. [DE 83-1, p. 6]. Following from that, he also wrote that he has no opinion whether antipsychotic medication is necessary to further those interests. [*Id.*]. When he was asked whether antipsychotic medication is necessity to restore Rodriguez to competency, his response was an unequivocal yes. [DE 85, pp. 51, 61].

539 U.S. at 181. This Court has no reason to think that it would be. Over the course of months, Drs. Graddy and Wadsworth have met with Rodriguez and actively solicited his consent to take prescribed antipsychotic medication. [DE 84-1; DE 65-1; DE 85, pp. 51-53, 83-87, 93-94, 97-98]. This did not work. This Court fully agrees with Dr. Graddy that there is "no compelling evidence that an incompetent defendant would understand the implications of a contempt order" and be able to make a rational decision whether to comply with it. [DE 82-1, p. 10; DE 83-1, p. 6, n.11; *see also* DE 85, p. 54].[33] The entire record in this case persuades the Court that there is nothing, short of a full trial of antipsychotic medication, which is likely to restore Rodriguez to competency.[34]

### 4. The proposed antipsychotic medications are medically appropriate (*Sell #4*)

Last, the Court must conclude that the medication is "medically appropriate, *i.e.,* in the patient's best medical interest in light of his medical condition." 539 U.S. at 181. Dr. Graddy answered this question in the affirmative. [DE 83-1, p. 6; DE 85, p. 54-55]. He explained:

> Mr. Rodriguez is suffering from a mental disease that there is a good treatment for, and even outside of the competency issue, he is truly suffering. We've been unable to house him . . . in any sort of less restrictive environment because his

---

[33] In his Appendix, Dr. Graddy recounted three instances at FMC Butner when an incompetent pretrial detainee was "presented with a contempt order for refusing to comply with court ordered psychiatric treatment." Two instances were unsuccessful and led to months of delay and additional detention of the defendant. One instance was successful. [DE 82-1, p. 11].

[34] Notably, in *Diaz*, the Eleventh Circuit agreed that proof of the defendant's repeated refusals to take medication and of the ineffectiveness of alternative treatments, established clear and convincing evidence of the third *Sell* factor. 630 F.3d at 1335-56; *accord Ruark*, 611 Fed. Appx. at 599.

> behavior is highly sexualized and delusional, and it has really
> caused us to have to place him in a very restrictive level of
> care that I think is unfortunate, given that there is a treatment
> we could give him that . . . he's proven when he's on the
> treatment he's done well.

[DE 85, p. 55]. Dr. Graddy reached this conclusion after months of observation of

Rodriguez and with the benefit of Rodriguez's positive response to the medications he

agreed to take. Dr. Graddy has laid out a thoughtful treatment plan and shown that it is

consistent with prevailing medical standards. Importantly, antipsychotic medications

have been available for decades, patients have safely taken them for decades, and they

have been well studied. [DE 82-1, p. 3; DE 85, p. 61]. Rodriguez is an otherwise healthy

young man; fortunately he does not suffer from any medical conditions for which

antipsychotic medications might be contraindicated.[35]

The government has established by clear and convincing evidence this final *Sell*

requirement.

## III.  Conclusion

For the reasons stated, I conclude that the government has established by clear and

convincing evidence that Rodriguez should be treated with antipsychotic medication,

without his consent, for the purpose of restoring him to competency.

---

[35] Although the Court must review the medical appropriateness of treatment as it applies to the
particular circumstances before it, it is worth noting that in *Ruark*, the Eleventh Circuit did
acknowledge the medical appropriateness of antipsychotic medications in treating schizophrenia.
611 Fed. Appx. at 599.

I therefore RECOMMEND that the Court enter an order that authorizes the medical professionals at FMC Butner to treat Rodriguez with the antipsychotic medications Risperidone, Haloperidol and/or Fluphenazine, and any medically necessary adjunctive medications, in a manner generally consistent with the proposed treatment plan and prevailing medical standards for the purpose of restoring Rodriguez to competency.

## IV.    Objections

**No later than fourteen days from the date of this Report and Recommendation** the parties may file any written objections to this Report and Recommendation with the Honorable K. Michael Moore, who is obligated to make a *de novo* review of only those factual findings and legal conclusions that are the subject of objections. Only those objected-to factual findings and legal conclusions may be reviewed on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985), 28 U.S.C. § 636(b)(1); Fed.R.Crim.P. 59(b), 11th Cir. R. 3-1 (2016).

Respectfully recommended in chambers, at Miami Florida, this 30th day of October, 2017.


_____
CHRIS MCALILEY
UNITED STATES MAGISTRATE JUDGE

Cc:    The Honorable K. Michael Moore
       Counsel of record